

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2008

**By Hand & ECF**
Honorable Shira A. Scheindlin
United States District Judge
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. Adam Tawik,</u>
               S2 07 Cr. 137 (SAS)

Dear Judge Scheindlin:

      The Government respectfully submits this letter in opposition to the letter submitted by defense counsel, Bruce McIntyre, Esq., regarding the sentencing of the defendant, Adam Tawik. In his letter, Mr. McIntyre argues that a sentence of two years, the statutory minimum, is warranted. For the reasons set out below, the Government respectfully submits that the Court should sentence the defendant to a term of imprisonment of 10 to 16 months, followed by the mandatory consecutive term of 24 months' imprisonment.

**Background**

      In mid-December 2006, William Nkrumah called Electrical Power Systems, Inc., a New Jersey company, and placed an order over the phone for two electrical power generators and some switches (for the generators), for a total cost of $16,605. Nkrumah used a phony name ("James Gary") to place the order, and gave several stolen credit card numbers to pay for the generators. Nkrumah asked that the generators be delivered to an address on Webster Avenue in the Bronx, New York. On the day of the scheduled delivery, however, Nkrumah changed the delivery location to Kuwait Shipping, a Bronx-based company that ships goods to West Africa. At Kuwait Shipping, Adam Tawik, the defendant, identified himself as "James Gary", signed for the generators (in the name "James") and accepted delivery of them.

      Shortly after this first delivery, Nkrumah placed a second call to Electrical Power Systems, Inc. This time, he ordered four generators and some switches, for a total cost of $20,000. He again provided several stolen credit cards to pay for the generators, and he asked that they be delivered to Kuwait Shipping. When the sales manager at Electrical Power Systems, Inc., ran the credit cards, however, the transactions were rejected. The manager learned from Citibank that the card numbers had been stolen and that the transactions had not been approved

by the credit card account holders.  At that point, the sales manager called the New York City Police Department ("NYPD") to report the theft of the two generators (which had been delivered in the first delivery).

On December 19, 2007, the NYPD, working with the United States Postal Inspection Service, made a controlled delivery of the four generators and the switches to Kuwait Shipping.  Prior to the delivery, the NYPD had instructed the driver of the delivery truck (who was the same person who had delivered the first set of generators), that he should only let the same person sign as had signed for the first delivery.  When the driver arrived at Kuwait Shipping, he was approached by both Adam Tawik and William Nkrumah, each of whom attempted to sign for the generators.  The driver recognized Tawik as the person who signed the first time, and so he told Tawik to sign.  Tawik signed in the name "James," and then Tawik and Nkrumah accepted delivery of the generators.  Several minutes later, Tawik and Nkrumah were arrested.  Tawik was interviewed by the NYPD (after waiving his Miranda rights), and confessed to having signed for the generators the second time (although he denied knowledge of any wrongdoing).

Superseding Indictment S2 07 Cr. 137 (SAS) was filed in the Southern District of New York on July 30, 2007.[1]  Count One charges Nkrumah and Tawik with using credit card numbers issued to others, without authorization, to purchase and attempt to purchase generators from a store in New Jersey, in violation of Title 18, United State Code, Sections 1029(a)(5) and (b)(1).  Count Two charges Nkrumah and Tawik with conspiring to commit credit card fraud, in violation of Title 18, United States Code, Section 1029(b)(2).  Count Three charges Nkrumah and Tawik with aggravated identity theft in connection with Counts One and Two, in violation of Title 18, United States Code, Section 1028A.  Superseding Indictment S2 07 Cr. 137 (SAS) also includes forfeiture allegations.

On September 4, 2007, a jury trial commenced before Your Honor.  The Government witnesses included the sales manager at Electrical Power Systems who took the phone orders from Nkrumah and who was present for the controlled delivery, the truck driver who made the two deliveries of the generators (the original delivery and the controlled delivery), a bank officer who explained Citibank's records concerning the credit card transactions, and two law enforcement officers who were present during the controlled delivery.  The Government also introduced (through stipulations) testimony from two of the victims of the credit card fraud.  On September 7, 2007, Nkrumah and Tawik were convicted after the jury trial on all three counts.

---

[1] Contrary to the description in the Pre-Sentence Report ("PSR") prepared by the United States Probation Office, the first superseding indictment, S1 07 Cr. 137 (SAS), filed on March 25, 2007, did not include all three charges against Tawik and Nkrumah.  See PSR ¶¶ 1-4.  The first superseding indictment only charged Nkrumah and Tawik with credit card fraud, in violation of Title 18, United States, Code, Sections 1029(a)(5) and 2.

Hon. Shira A Scheindlin
January 13, 2008
Page 3

In the PSR, the United States Probation Office computes the Sentencing Guidelines range for Adam Tawik to be 10 to 16 months, followed by a mandatory consecutive term of 24 months' imprisonment (for Count Three).  Specifically, the Probation Office found that the base offense level is six and that a six-point enhancement was necessary because the loss amount is $36,605.  With Criminal History Category I, this results in the Guidelines of 10 to 16 months, plus the two year consecutive term required by Count Three.  The Probation Office recommends a sentence of 10 months' imprisonment, followed by the two-year term.

In his letter dated January 8, 2008, defense counsel for Adam Tawik argues that the Court should impose a sentence of two years' imprisonment, the mandatory minimum.  Defense counsel implies that Tawik is innocent of the offenses, and that he was "duped by an unscrupulous con man" into "doing a favor for [] a countryman."  Defense counsel further argues that the loss amount is $20,000, not $36,605, because "Tawik was not involved in the first delivery," and that there should be a four-point downward adjustment because Tawik played a minimal role in the offenses.  Accordingly, defense counsel computes the total offense level to be 6, with a corresponding Guidelines range of 0 to 6 months.

As explained below, the Government respectfully submits that the loss amount attributable to Tawik is $36,605, and that Tawik should not be given a downward adjustment for role.

## Sentencing Recommendation

**I.     Tawik knowingly and intentionally committed the offenses for which he was convicted.**

Any suggestion that Tawik acted without knowledge or intent should be flatly rejected.  The Court specifically charged the jury that, to commit the crime of credit card fraud, as charged in Count One of the Superseding Indictment, the jury had to find that the defendant acted knowingly, willfully, and with intent to defraud.  Likewise, the Court charged the jury that, to commit the crime of credit card fraud conspiracy, as charged in Count Two, the jury had to find that the defendant joined the conspiracy knowingly.  Finally, with respect to the crime of aggravated identity theft (charged in Count Three), the Court charged the jury that it must find that the defendant knowingly transferred, possessed, or used, or aided and abetted the transfer, possession, or use, of a "means of identification" of another person.  Thus, to hold Tawik guilty of the three crimes charged in the Superseding Indictment, the jury necessarily rejected defense counsel's argument that Tawik was duped or conned.  The jury necessarily found–beyond a reasonable doubt–that Tawik acted with knowledge and intent to defraud.

Hon. Shira A Scheindlin
January 13, 2008
Page 4

## II.    The Loss Amount attributable to Tawik is $36,605.

Contrary to defense counsel's assertion, there is more than ample evidence to establish, by a preponderance of the evidence, that Tawik was involved in the first delivery and that therefore the loss associated with the first delivery is attributable to Tawik.  At trial, Detective Fitzgibbons of the NYPD testified that, at the time of Tawik's arrest, the truck driver who made the deliveries of the generators identified Tawik as the person who signed for the generators on both occasions (the first delivery and the controlled delivery).  Likewise, the driver testified that, after the controlled delivery, he identified the person who had signed on both occasions, and that he recognized the person from the first delivery and made that person sign for the controlled delivery.  Tawik himself admitted in his post-arrest statement that he signed for the generators at the time of the controlled delivery, and thus (per the driver's testimony), he signed for the generators at the time of the first delivery.

Additionally, circumstantial evidence establishes that Tawik signed for the generators on both occasions.  The signatures on the credit card receipts and sales invoices for the first <u>and</u> controlled deliveries were "James" (and not "James Gary"), indicating that the same person signed for the generators on both occasions.  Moreover, the signature of "James" (and not "James Gary") suggests that the person signing did not know the last name of the phony name being used.  Nkrumah clearly knew the last name–he had given the full name on multiple occasions.  Tawik may not, however, have known the last name, which explains why he only signed the receipts "James."

Defense counsel points to the fact that, at trial, the truck driver identified Nkrumah as the person at the first delivery.  As the Government argued to the jury, however, the in-court identification was unreliable.  First, the in-court identification occurred more than nine months after the incident, whereas the post-arrest identification of Tawik occurred immediately after the incident.  Common sense tells us that the identification occurring right after the incident is more reliable.  Second, one week prior to trial, the driver had been shown a photo array including a photograph of Nkrumah and he had been unable to identify <u>anyone</u> in the photo array.  These contradicting facts establishes that, by September 2007, the driver no longer had a memory of the person who had signed for the generators.

Defense counsel also points to the fact that, at trial, the driver testified that he believed the person who signed for the generators was the same person with whom he spoke on the phone.  We know that his believe was, however, mistaken.  Tawik admitted that he signed the second time, yet no one believes that Tawik was the person who spoke over the phone to the driver.  The fact that the driver thought the person who signed had the same voice as the person on the phone may be the product of the fact that both Nkrumah and Tawik are from the same country and therefore may have similar accents.

Hon. Shira A Scheindlin
January 13, 2008
Page 5

**III.     Tawik was not a minor or minimal participant in the offenses.**

The Guidelines explain that the minimal participant adjustment applies to a defendant who is "among the least culpable of those involved in the conduct of a group," and points to the defendant's lack of knowledge or understanding of the scope and structure of the enterprise, and of the activities of others, as factors to consider.  U.S.S.G., App. Note 4 to § 3B1.2.  The Guidelines further advises that the downward adjustment for a minimal participant "will be used infrequently."  Id.  The Guidelines explains that a "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal."

As the Second Circuit has explained, "[a] reduction under § 3B1.2 'will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be "minor" or "minimal" as compared to the average participant in such a crime.'"  United States v. Vargas, 170 Fed. Appx. 779, 781 (2d Cir. March 17, 2006) (quoting United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999) (per curiam)).  In Vargas, the Second Circuit held that a defendant's repeated warnings to others of the police presence, and his carrying of instructions with respect to converting black tar heroin to beige heroin, was not minor or minimal, but actually "integral to the transaction."

The Government concedes that Tawik was a lesser participant in the offenses.  All of the evidence in this case indicates that Nkrumah was the driving force behind the credit card fraud.  Nkrumah ordered the generators, Nkrumah possessed the stolen credit card numbers, and Nkrumah provided the numbers to Electrical Power Systems, Inc., to pay for the generators.  It was also Nkrumah who made arrangements with Kuwait Shipping to receive the generators and to ship them to West Africa.  Tawik's role was limited to signing for the generators and accepting their delivery.

Tawik was not, however, a minor or minimal participant under U.S.S.G. §§ 3B1.2(a), (b).  Tawik's signing for the generators was integral to the success of the conspiracy.  Moreover, as explained above, in signing for the generators, Tawik acted with the intent to defraud.  He knew that he lacked authorization from the real owners of the credit card account numbers, yet he signed credit card receipts on two occasions for goods totaling $36,605 and he accepted delivery of massive electrical equipment.  Indeed, Tawik accepted delivery of the generators at a shipping store, indicating that he also knew of the plan to ship the generators out of the country before the fraud was discovered.

Accordingly, the Government respectfully submits that the appropriate Guidelines range is 10 to 16 months' imprisonment, followed by the mandatory two year consecutive sentence, as calculated by the Probation Office.

Hon. Shira A Scheindlin
January 13, 2008
Page 6

## Conclusion

The Government respectfully submits that a sentence of imprisonment within the Guidelines range is sufficient but not greater than necessary to achieve the goals of sentencing. Such a sentence would promote respect for the law, provide punishment for the defendant's violations of the law, and afford adequate deterrence both to the defendant and others. *See* 18 U.S.C. § 3553(a).

                              Very truly yours,
                              MICHAEL J. GARCIA
                              United States Attorney

By:   /s/ Parvin Moyne
        Parvin Moyne
        Assistant United States Attorney
        Telephone: (212) 637-2510

cc: Bruce McIntyre, Esq. *(by ECF & facsimile)*